**b.      Charges**

Savoie pleaded guilty to conspiracy, in violation of 18 U.S.C. § 371, and 13 counts of

arson, in violation of 18 U.S.C. § 844(i), in connection with the following sites:

> Superior Lumber Company (1),
>
> Jefferson Poplar Farm (12), and

one count of attempted arson, in violation of 18 U.S.C. § 844(i) for the Jefferson Poplar Farm.

**c.      Role in the Offense**

Savoie's roles in the crimes of conviction are briefly described below:

01/02/01      Superior Lumber Company, Glendale, Oregon -- $1,041,696 loss

> Savoie served as a lookout and assisted McGowan in writing the communique afterward.

05/21/01      Jefferson Poplar Farm, Clatskanie, Oregon -- $994,412.42 loss

> Savoie did advance research about the target, participated in a "dry run" beforehand, and served as the driver and lookout at the arson.

**d.      Restitution**

The damage resulting from the arson at the Superior Lumber Company was

$1,041,696.00, and from Jefferson Poplar Farm, $994,412.42, for a total restitution figure of

$2,036,108.42.

**e.      Aggravating Factors**

A long-time activist, Savoie began participating at an early age in anti-GE actions, later

escalating to arsons.  Although she served only as a lookout in both arsons (as well as the driver

at Jefferson Poplar Farm), she also did advance research about the latter, participated in the "dry

run" beforehand, and helped produce the Superior Lumber communique.

**f.      Mitigating Factors**

Although Savoie was involved in anti-GE activities and all of the Book Club meetings, her role in the two arsons was minor, i.e. as a lookout in both (and driver at Jefferson Poplar). Hence the government is recommending a two level reduction for minor role.

**g.      Cooperation**

As previously mentioned, a separate letter is being sent to the court detailing the extent and value of each defendant's cooperation.

**h.      Specific Advisory Guideline Calculations**

As indicated in section III.B.2 above, Savoie's base offense level is 38VI.  To that the following adjustments should be made:  Two levels should be added for combined offense level (multiple offenses) under U.S.S.G. § 3D1.4, two levels should be subtracted for minor role under § 3B1.2(b) and three levels should be subtracted for acceptance of responsibility under § 3E1.1, for an adjusted offense level of 35VI (292 - 365).

**i.      Sentence Recommendation**

Savoie and the government understand and agree that the court will consider 18 U.S.C. § 3553(a) factors in determining the appropriate sentence in this case.

Based on the above, the government recommends up to a 16-level downward departure pursuant to U.S.S.G. § 5K1.1 for substantial assistance to authorities**,** in conjuction with § 3553(a) factors, for an ultimate advisory guideline of 19VI (63 - 78).  The government recommends a sentence at the low end of the advisory guideline range, **63 months imprisonment**.  Savoie is free to request other adjustments or departures, but the government will oppose any such request.

10.    **Kendall Tankersley**



a.    **Background**

Kendall Tankersley, aka Sarah Kendall Harvey, 30, moved to Eugene from Ohio in the fall of 1995 to attend the University of Oregon.  In the spring of 1997, she joined Cascadia Forest Defenders and began participating in environmental activism, including protests against tree-cutting.  That summer she was arrested during a protest at the China Left timber sale in Southern Oregon.  It was there she met Jacob Ferguson.

The next summer, Tankersley attended the Earth First! Rendezvous in Oregon and began dating Ferguson.  Soon afterward, the two of them decided to escalate their protest activities to arson.  Tankersley had spent some time in Humboldt County, California, so the two of them decided to target two log trucking companies in the area.  On September 28, 1998, Tankersley and Ferguson drove to the Redwood Coast Trucking Company in Arcata, California.  Upon arrival, Ferguson poured fuel from large containers into 11 one-gallon plastic milk jugs while Tankersley held them.  Ferguson placed one  incendiary device in each of 10 logging trucks while Tankersley placed one device in a single truck.  Ferguson lighted the devices and they left the site.  Only one device functioned, causing the total destruction of one logging truck at a cost of $40,000.

Tankersley and Ferguson then traveled to the Wayne Bare Trucking Company where Ferguson cut a hole in the chain link fence encircling the business, and crawled into the yard where numerous logging trucks were parked.  He lighted an incendiary device, but his fuel-soaked gloves caught fire, causing the device to prematurely ignite.  He ran back to the hole in the fence, which Tankersley was crawling through, and told her they had to leave because of the premature ignition.  The Aracata Fire Department responded quickly and extinguished the flames from the pine needles and grass on the ground inside the fenced area.  No monetary loss was suffered by the business.

Approximately three months later, Ferguson, Tankersley and Tubbs drove to Medford and did a "dry run" of the U.S. Forest Industries office.  Afterward, they decided they needed a fourth person to do the arson, so Tubbs recruited Rubin, a woman he was dating at the time, to assist.

On the date selected for the arson, Tubbs and Rubin picked up Tankersley and Ferguson, and they drove to U.S. Forest Industries.  Tubbs drove the vehicle and dropped off Tankersley a block from the business.  She ran across the highway and hid in a ditch to serve as a lookout. Ferguson and Rubin carried the incendiary devices to the office where Ferguson set them up while Rubin stood nearby as a lookout.  The devices failed to function.

Not hearing anything about a fire, Ferguson subsequently drove by U.S. Forest Industries and saw the buckets of fuel still in place.  He called Tankersley and asked her to retrieve the devices.  She agreed and drove to Medford with another person, saw the buckets of fuel in front of the building, but did not remove them.

Page 129  -  **Government's Sentencing Memorandum**

Shortly after Christmas 1998, Tankersley and Ferguson drove back to U.S. Forest Industries.  Tankersley parked on a nearby street, and Ferguson walked to the business, found the buckets, re-filled them with fuel and improvised a new ignition device.  He then lighted it, creating a fire which caused approximately $990,220 in damage.

### b.      Charges

Tankersley pleaded guilty to conspiracy, in violation of 18 U.S.C. § 371, one count of attempted arson and one count of arson, in violation of 18 U.S.C. § 844(i), in connection with the U.S. Forest Industries arson.  She was not charged with the Redwood Trucking Company and Wayne Bare Trucking Company arsons in Arcata, California.

### c.      Role in the Offense

Tankersley's role in the December 1998 U.S. Forest Industries arson was to serve as a lookout.

### d.      Restitution

The damage resulting from the Redwood Trucking Company arson was $40,000, and from U.S. Forest Industries, $990,220, for a total restitution figure of $1,030,220.  As previously indicated, no monetary loss was sustained by the fire at the Wayne Bare Trucking Company.

### e.      Aggravating Factors

Although principally serving as a lookout for each of the arsons, Tankersley did place one incendiary device herself in one of the logging trucks at the Redwood Coast Trucking Company.  It is unknown whether this was the device which functioned successfully.  She also performed research and reconnaissance on other targets, including Boise Cascade and Litchfield BLM Wild Horse Corrals.

Page 130  -  **Government's Sentencing Memorandum**

**f.       Mitigating Factors**

Although she was involved in three separate arsons, Tankersley's principal role was as a lookout.  Hence the government is recommending a four-level reduction for minimal role under U.S.S.G. § 3B1.1(a).   To the government's knowledge, Tankersley has not been involved in any illegal activities since her return to California to attend Humboldt State University.

**g.       Cooperation**

As previously mentioned, a separate letter is being sent to the court detailing the extent and value of each defendant's cooperation.

**h.       Specific Advisory Guideline Calculations**

As indicated in section III.B.2 above, Tankersley's base offense level is 38VI.  To that the following adjustments should be made:  Four levels should be subtracted for minimal role under § 3B1.2(a) and three levels should be subtracted for acceptance of responsibility under § 3E1.1, for an adjusted offense level of 31VI (188 - 235).

**i.       Sentence Recommendation**

Tankersley and the government understand and agree that the court will consider 18 U.S.C. § 3553(a) factors in determining the appropriate sentence in this case.

Based on the above, the government recommends up to a 14-level downward departure pursuant to U.S.S.G. § 5K1.1 for substantial assistance to authorities**,** in conjuction with § 3553(a) factors, for an ultimate advisory guideline of 17VI (51 - 63).  The government recommends a sentence at the low end of the advisory guideline range, **51 months imprisonment**.  Tankersley is free to request other adjustments or departures, but the government will oppose any such request.

Page 131  -  **Government's Sentencing Memorandum**

11.    **Darren Todd Thurston**



a.    **Background**

Darren Todd Thurston, 27, was born and raised in Alberta, Canada.  In high school he became interested in animal rights issues and helped form a group called Citizens Organized for Animal Liberation.  In that protest group, Thurston became familiar with violent ALF activities in the United Kingdom, and he distributed ALF-UK literature.  In 1990 Thurston began his long-term association with Canadian ALF operative David Barbarash.  Thurston began the Western Canada ALF Support Group, which took over from Barbarash's Eastern Canada ALF group when it closed.

In 1990, at age 20, Thurston was arrested for spray-painting graffiti and damaging billboards.  With Barbarash in 1991, he became interested in targeting the University of Alberta for future animal releases.  He was frustrated that his protests and vandalism had not achieved results, so he turned to arson.  In December 1991, Thurston burned three trucks at a fish company, using ALF-UK publications on timing devices.  He attempted to re-print an arson primer, but the local printer called the police.  The publication ended up being distributed by others in Canada.

Page 132  -  **Government's Sentencing Memorandum**

In June 1992, Thurston and Barbarash targeted a research station at the University of Alberta for an animal release.  They burglarized the facility and stole 29 cats.  After police tracked him down, Thurston pleaded guilty to the burglary and the 1991 truck arson, which led to a prison term.        In the spring of 1994, while released on appeal, Thurston traveled to Northern California for an Earth First! gathering, where he met Jonathan Paul and Kevin Tubbs. He then returned to Canada to serve the rest of his sentence.

In 1996 Thurston attended an anti-fur protest in Seattle, where he met Paul again, and began an association with Gina Lynn, founder of the Animal Rights Direct Action Coalition.  In late 1996, on his way to San Francisco, Thurston stopped in Eugene and visited Tubbs.  With Lynn, Thurston traveled around Oregon, California and Utah reconnoitering fur farms.  In 1996 Thurston completed the first edition of *The Final Nail: Destroying the Fur Industry–A Guided Tour*, in which he had invested 500 hours of research.  The pamphlet contained detailed information about numerous fur farms in Canada and the United States and included information on incendiary devices, including the type Thurston used to burn the fish trucks in 1991.  The publication was posted on the Internet and went through a second edition, also by Thurston, which added 40-50 more fur farms.  A later edition contained incendiary device instructions provided to Thurston by Joseph Dibee through encrypted e-mail.

In 1996-97 Thurston and Lynn targeted Bio-Devices, an Orange, California medical research laboratory.  They conducted surveillance and reconnaissance two or three times, particularly examining the types of alarms in place.  However, because of his trial in Canada, Thurston was not involved in the actual burglary and animal release at Bio-Devices.

While again illegally in the United States in 1997, Thurston and others "reconned" a large taxidermy facility in Southern California, with plans to spray paint and glue locks, but it did not occur.  He and Lynn got closer to a planned arson of trucks at a meat company in San Diego.  While preparing incendiary devices, they noticed a homeless man in the vicinity, which caused them to abort the crime.  In February 1998, Thurston was arrested at a mall in California, leading to his six-week detention and voluntary removal to Canada.

Thurston was ALF's primary publicist from 1995 to about 2001.  During that time he received 100-200 communiques from all over the world, reporting a huge array of illegal activities.  Right up until the time of his arrest in 2005, Thurston hosted websites that taught internet security and anonymity for users.  From these, Dibee, Rubin, Tubbs and others learned how to use "dead drops" (anonymous e-mail accounts with unsent messages stored in the draft folder) for communicating secret messages.

As far back as 1990-91, Thurston authored *The ALF Primer:  A Guide to Direct Action and the Animal Liberation Front*.  In the late 1990s he posted it on the Internet in PDF format, thereby providing more advice to like-minded people in attacking targets.  Although he did not write *Arson-Around with Auntie ALF: Your Guide for Putting the Heat on Animal Abusers Everywhere*, Thurston re-formatted it and placed it on his website for others to use.  He spent weeks working on *Setting Fires with Electrical Timers: an Earth Liberation Front Guide*, transforming it from bulky multiple PDFs into one large version.  It was released on the Internet just after the Jefferson Poplar Farm arson and encouraged similar criminal acts in the future.

Thurston and ELF publicist Craig Rosebraugh communicated via e-mail after the U. S. Forest Industries arson in Medford in 1998.  Upon receiving the ELF communique for the arson,

Thurston wrote to Rosebraugh, "I presume that you will do a media release?"  Rosebraugh

complied with Thurston's request, thereby achieving the publicity the Family wanted.  Thurston

and Rosebraugh spent hours finalizing the media release for the 1998 Vail arson, based on the

communique authored by Gerlach and Rodgers.

      Thurston was the mediator in the Family's dispute over the communique for the 2001

Jefferson Poplar Farm arson.  Rosebraugh received the original communique and contacted

Thurston about the inaccurate listing of the target.   To the dismay of Family members,

Rosebraugh changed the communique to correctly name the victim.  The matter was serious

enough for Dibee to drive Gerlach to Vancouver, B.C., to meet with Thurston.  She asked

Thurston to relay to Rosebraugh the group's anger.  Thurston e-mailed Rosebraugh, who also

traveled to Vancouver to meet with him.  Because of the controversy, Rosebraugh ended up

resigning as ELF's publicist.  Thurston recruited a Canadian to take over the job as spokesperson

for the North American ELF Press Office.

      In the summer of 2001, Gina Lynn sought Thurston's help in correcting Daniel

McGowan's tendency to talk too much.  Thurston told McGowan running his mouth off would

not be tolerated, and McGowan replied that would no longer be a problem.

      In October 2001, Thurston received e-mails from Dibee and Rubin regarding a possible

action in the U.S.  Thurston and Rubin illegally crossed the border with Dibee and were picked

up by Jennifer Kolar.  While at Dibee's Seattle house, Thurston learned the nature of the

upcoming action at the BLM horse facility in Litchfield and requested to be part of the horse

release portion.  Thurston helped install the roof rack and washed the backpacks and other

implements to remove fingerprints.  At Kolar's apartment Thurston and Dibee received "clean"

Page 135  -  **Government's Sentencing Memorandum**

maps.  The group left Seattle and picked up Tubbs in Eugene.  At the target Thurston dressed in black, wore socks over his shoes, and communicated with the others via two-way radios.  He cut through wire and wood fences to get to the horses.  His attempt to lead the horses out of the corrals failed, however.  The facility burned, and the group left for home.  In the car Thurston completed a rough draft of the communique on his Palm Pilot.  In Seattle he helped wash down the tools and implements again.  Kolar drove Thurston and Rubin north, and they hiked over the border.  The next day Thurston further researched and completed the communique, and sent it out via e-mail.

Thurston became romantically involved with Gerlach in 2001, and they remained together until their arrests on the current charges.  Thurston illegally entered the United States again in the summer of 2002.  This crossing involved long hikes in remote terrain with the help of GPS equipment.  Thurston and Gerlach moved to San Francisco, where they rented an apartment under a false name.  They traveled to New York and New Jersey to perform reconnaissance and take pictures of bio-engineering facilities, primarily ones owned by Monsanto.  Back in California in the winter of 2002, Thurston and Gerlach began to make money selling marijuana. Worried about being caught, they moved to Portland in 2003, where they continued to move marijuana in two to four-pound quantities.  Gerlach rented the apartment under an assumed name, while Thurston went by the name Ian Holladay.  He kept additional identification in the name of a real Canadian, a false permanent resident alien card and a false social security card.  Kevin Tubbs provided him with lost identification cards of real people that Tubbs had collected at the adult store where he worked in Springfield.  Thurston used a stolen credit card number to make purchases.

Page 136  -  **Government's Sentencing Memorandum**

In the summer of 2003 Thurston and Gerlach went to Utah for reconnaissance of the Predator Research Station and facilities of Utah State and Logan State universities. They researched the sites through a library computer.

The same year Thurston and Gerlach dug up a cache of guns buried at the Lane County house where she had once lived with Meyerhoff. They reburied the guns in the forest near the Oregon coast. Thurston accompanied Gerlach to Las Vegas, where she purchased two firearms and ammunition at a gun show, along with cannon fuse and books on radio-controlled detonators and improvised incendiary devices. They also buried these items near the same coastal site.

Thurston re-entered Canada and illegally returned to the United States twice in 2003. The second time he returned with two ounces of MDMA, the illegal drug ecstasy, which he and Gerlach sold repeatedly up until the time of their arrests. They also dealt in LSD, marijuana, and illegal mushrooms.

Thurston was approached by persons interested in translating into Spanish the publication *Setting Fires with Electrical Timers* so it could be sent to the Zapatista guerrillas in Mexico. In the spring of 2003 Thurston met a representative of the Zapatistas. He requested that Thurston teach a class on producing explosives that could take down a building or bridge. Thurston did research and learned how to make the explosive HMTD, which he tested in Portland. He taught the workshop on explosives in a tent near Redway, California. Together with Gerlach and others, Thurston produced seven to ten grams of HMTD and detonated it, blowing up a stump. The Zapatista representative was very satisfied. Thurston further instructed him on HMTD use and storage, and recorded the information in a text file for him to take to Mexico.

Page 137  -  **Government's Sentencing Memorandum**

      **b.**      **Charges**

Thurston entered guilty pleas to conspiracy, in violation of 18 U.S.C. § 371, and one count of arson in violation of 18 U.S.C. § 844(f)(1), by way of a Rule 20 transfer from the Eastern District of California, in connection with the arson at the Litchfield BLM Wild Horse Facility.

      **c.**      **Role in the Offense**

Although Thurston actively participated with the Family only in its last arson, his overall role in the offense can only be assessed by viewing his unlawful activities throughout his adult life.  In several important ways he provided support for the Family and worked in tandem with its members.  Thurston for many years was a virtual "godfather" to the ALF and similar underground groups.  (His e-mail address, "oldman," was indicative of his stature.)   He was responsible for the ALF website, which supported a large array of illegal acts.  He provided the necessary publicity to further ALF goals, forwarded communiques reporting crimes, and authored, edited and distributed publications that aided saboteurs.  His involvement extended long after the final arson of the Family, and included firearms activities and instructing others in explosives.

10/15/01        Litchfield BLM Wild Horse Facility, Litchfield, California -- $207,497.60 loss

              Thurston was directly recruited by the leader Dibee, who knew and trusted him.  Using extreme caution, Thurston illegally crossed the border with fellow Canadian Rubin.  He carefully prepared equipment for the crime to ensure the participants could not be traced, and he cleaned the equipment upon return.  He actively engaged in the crime by cutting fences and attempting to release horses.   He authored the communique and distributed it upon returning to Canada.

**d.      Restitution**

The total estimated loss for the arson personally committed by Thurston is $207,497.60.

**e.      Aggravating Factors**

 Thurston's actitvities from the early 1990s until the day of his arrest in December 2005 were those of a wholly committed criminal and saboteur.   Felony convictions in Canada, close involvement with other lawbreakers, operation of websites, publishing dangerous how-to manuals--all demonstrate why the Family chose him as a participant in the 2001 arson.  From 2001 through 2005 he supported himself by selling controlled substances.  He illegally crossed the border on repeated occasions and lived illegally in the United States.  Identity fraud was a way of life for him.  (An indictment charging false identity crimes will be dismissed as part of the instant plea agreement.)  He illegally possessed and hid several firearms.  His various publications  instructed and encouraged others in violent acts.  This culminated in his assistance to Mexican guerrillas with improvised explosives.

**f.      Mitigating Factors**

Because of Thurston's relatively limited participation in his one arson, the government is recommending a four-level reduction for minimal role under § 3B1.1(a).  Other Family members did far more to accomplish the Litchfield BLM arson, and Thurston's role was substantially less.

**g.      Cooperation**

As previously mentioned, a separate letter is being sent to the court detailing the extent and value of each defendant's cooperation.

### h.    Specific Advisory Guidelines Calculations

As indicated in section III.B.2 above, Thurston's base offense level is 38VI.  To that the following adjustments should be made:  Four levels should be subtracted for minimal role under § 3B1.2(a), and three levels should be subtracted for acceptance of responsbility under § 3E1.1, for an adjusted offense level of 31VI (188 - 235).

### i.    Sentence Recommendation

Thurston and the government understand and agree that the court will consider 18 U.S.C. § 3553(a) factors in determining the appropriate sentence in this case.

Based on the above, the government recommends up to a 17-level downward departure pursuant to U.S.S.G. § 5K1.1 for substantial assistance to authorities**,** in conjuction with § 3553(a) factors, for an ultimate advisory guideline of 14VI (37 - 46).  The government recommends a sentence at the low end of the advisory guideline range, **37 months imprisonment**.  Thurston is free to request other adjustments or departures, but the government will oppose any such request.

The United States Attorney for the Eastern District of California is in agreement with the anticipated 37-month sentence recommendation and recommends a sentence in Case Number CR- 06-60120-AA (former Eastern District of California Case No. 2:06-CR-00155-DFL) of 37 months, to run concurrently with the anticipated 37-month sentence in the District of Oregon.

12.    **Jonathan Mark Christopher Paul**



a.    **Background**

Jonathan Mark Christopher Paul, 41, has long been a public figure in activist circles, including those advocating criminal activity.  In the September 27, 1999, issue of *The Oregonian*, Paul was quoted as saying:

> None of the processes work . . . like the legal process, litigation.  We compare ourselves to the underground railroad, to some guerrilla movements that are trying to free themselves from oppressive governments. The only thing that's different about us is that we expand our thinking to other species and to the planet as a whole.

One of Paul's earliest criminal acts was the October 26, 1986 ALF burglary and animal theft at a University of Oregon laboratory in Eugene.  Paul took part in the six-month planning for the crime, including two "recons" of the building and a preparatory break-in with videotaping of the interior.  One of about ten people who carried out the crime, Paul stole animals from the building and helped destroy equipment used for research.  Criminal charges were dismissed, but Paul has subsequently admitted his role to authorities.

In 1987 Paul co-founded the Hunt Saboteurs Association, which opposed, and actively interfered with, the hunting of elk, bear and bighorn sheep.

Paul turned to arson on April 16, 1987, at the veterinary school of the University of California at Davis.  In addition to reconnaissance of the building, Paul acted as a driver, dropping off people who actually set the fire.  It was the first U.S. arson attributed to the ALF.

Also in 1987 Paul assisted in a burglary at a Loma Linda University research facility in Southern California.  Animals and boxes of documents were stolen.  Paul drove the van which transported the actual burglars and carried away the stolen animals.

Paul and others broke into the BLM Wild Horse Corrals in Litchfield, California, in May 1987.  He drove his van and performed reconnaissance of the facility.  Using a hand saw, Paul cut out a large section of a wooden fence and removed horses from the corrals.

In 1988 Paul lived in Santa Cruz with Rodney Coronado, a well-known ALF member who served several years in federal prison for multiple arsons.  They also lived together in 1990 in Scotts Valley, California.

On April 3, 1989, a burglary and arson occurred at the University of Arizona in Tucson.  Paul drove there from California in his van.  With another person, he boldly performed a daytime interior reconnaissance, dressing in coveralls so they looked like lab personnel.  Paul modified one of the doors so it could be opened later that night.  He took part in the burglary and animal theft.  He was aware of fuel and incendiary devices present in the van.  After about 1200 animals were stolen, other participants went on to perform the arson.

On October 17, 1990, Paul was arrested in Eugene and charged with the 1986 burglary at the University of Oregon.  Those charges were dropped on May 1, 1991.

On November 3, 1992, Paul was jailed in Spokane, Washington, after being found in civil contempt for refusing to testify before a federal grand jury.  The Ninth Circuit affirmed the

contempt order on December 10, 1992, and he remained in custody until April 9, 1993. During

the coming years, Paul used his Spokane experience to instruct others in resisting grand jury

investigations.

In the mid-1990s, Paul used his family wealth to purchase property in remote Williams,

Josephine County, Oregon, where he lived until moving to his current residence near Ashland.

During this time Paul maintained his public and private association with animal rights and

environmental activists. In October 1996 Paul dug ditches and blocked the road at the China

Left timber sale protest in Southern Oregon, but avoided being arrested.

In 1997 Paul became acquainted with Jennifer Kolar at a meeting in Minneapolis,

Minnesota. At that time she was a student at the University of Colorado in Boulder. They

developed a long-distance romantic relationship, and Kolar visited Paul at his Williams house.

During one of these visits Paul asked Kolar about becoming involved in an ALF/ELF crime.

This led to their joint participation in the Cavel West arson in Redmond. On several occasions

Paul gave Kolar money. His bank account reflects six checks to her, totaling $1295.00. One of

the checks, for $500.00, was written on July 22, 1997, the day after the Cavel West arson, to help

pay for her travel to and from Oregon.

According to Paul, he was recruited to assist in the Cavel West arson while attending the

Earth First! Rendevous in Oregon. His recruitment occurred because of his reputation and

experience. Paul attended a meeting in Eugene where Cavel West was targeted. His job was to

make the fuel for the arson. With Kolar's assistance at his Williams residence, Paul made

"Vegan Jell-O," a combination of glycerin soap and diesel designed to burn slower and better.

He painted the buckets black and made sure they had no fingerprints. With others, Paul

Page 143  -  **Government's Sentencing Memorandum**

"reconned" the target.  The group assembled at a rural staging area outside Redmond and put on disposable black clothing.   Paul's role at the scene was as a lookout.  To do this, he communicated via two-radio with the others.  He also helped carry fuel to the site.  After about 45 minutes at the scene, there was a premature ignition, and Paul used the radio to call for pickup.  He and the others poured acid on their clothes and buried them at the staging area.

Being a public figure, Paul was interviewed by the media about arsons, which he generally favored as techniques in environmental and animal rights activities.  Two years after Cavel West he told *The Oregonian* that the horse meat plant arson was a good example of economic sabotage and called it a "complete success."

Paul continued to be a public spokesman for extremist and illegal activities.  He gave presentations at the E-Law Conference in Eugene on March 6, 1998.  Although not admitting his own active involvement, Paul gave his support to "actions" against those who damage the planet.  To him, striking out against inanimate objects was not violence.  He advocated the continued evolution of actions, including "actions at night."  Burning labs is not a bad thing, he said at the conference, since it is analogous to burning down a Nazi death camp.  Defending living things may have to be "extreme," he said.  In this context, he added, using force to stop physical force "is the right thing to do."

Acknowledging that his presentation at the conference was likely illegal, Paul nonetheless publicly advocated resisting grand juries to the point of going to jail, as he had in 1992.  He admitted lying in the Spokane grand jury before taking the Fifth Amendment.  Paul told the conference the U.S. District Judge who found him in contempt was a "moron."  People who cooperate with the government are "traitors," Paul said, and he emphasized the need to stay

strong when called to testify.  At the 1998 conference Paul was photographed in the company of Kevin Tubbs.

Paul dedicated his time to the Sea Defense Alliance and the Ocean Defense International, particularly in opposition to, and unlawful interference with, whale hunting by the Makah Indians in Neah Bay, Washington.  With Paul's encouragement and assistance, numerous people were arrested and prosecuted in the Western District of Washington.  On May 11, 1999, Paul was arrested by the Clallam County Sheriff's Office and cited for violation of the Marine Mammal Protection Act.

On March 5, 2005, while in Eugene for another E-Law conference, Paul met with cooperating witness Jacob Ferguson.  Their conversation was monitored and recorded by the FBI.  When the conversation centered on the federal investigation, Paul advised, "Keep resisting it. You'll win . . . The more you resist, you'll win."  He added:

> You know I did like, last year, when that was going on, I did a little talk on grand jury stuff.  You know, what more can I say but, to people, but hey resist it.  If I did it, anyone can do it . . . It's the only honorable thing you can do. Fuck them.

Paul noted that he and Dibee had worked together in the anti-whaling campaign but "had a big falling out."  Dibee "tried to take over the group" and "tried to destroy me," Paul said.

In the same 2005 conversation, Paul and Ferguson discussed the federal investigation of their associates.  "You know, they don't have proof of anything," Paul said.  He referred to his own experience to show the need to be careful with investigators:

> [T]he first time the Feds visited me back in 1989 or something like that in Sacramento.  I knew they were coming so I was prepared.  But they didn't really freak me out.  I didn't let them in the house.  But I did make a mistake. When I first, this was in '89 when, and he handed me his ID to check, and I touched it.  And they got fingerprints off of it.  And I realized after . . . that,

Page 145  -  **Government's Sentencing Memorandum**

because they didn't have my fingerprints, you know.

**b.** **Charges**

Paul entered pleas of guilty to conspiracy in violation of 18 U.S.C. § 371 and one count

of arson in violation of 18 U.S.C. § 844(i) in connection with destruction of the Cavel West

facility.

**c.** **Role in the Offense**

Paul was recruited for the Cavel West arson because of his prior experience and strong

dedication to the cause. Although it was his only arson with the Family, he was already a proven

and proud saboteur, having previously committed arson, burglaries, thefts and related crimes

over the years. Younger and less experienced saboteurs looked up to him as a mentor and virtual

hero. That would continue long after Cavel West. Indeed, just a few months before his arrest for

the current charges, he was still promoting the cause and advocating resistance to federal

investigators. Paul's role at the Cavel West arson is briefly described as follows:

07/21/97        Cavel West, Redmond, Oregon – $1,211,388.76 loss

> Paul drew on his prior experience to commit this crime. He recruited
> Jennifer Kolar to take part (in fact, she would never have been a
> participant but for Paul asking her). He contributed to the planning and
> performed reconnaissance. His role included the fuel mixture, which he
> produced flawlessly. He helped carry fuel and assisted at the scene as a
> lookout. When the fire ignited prematurely, Paul radioed for a quick pick-
> up and exit.

**d.** **Restitution**

Paul has entered into an agreement with the government and the private insurer of Cavel

West that his payment of $250,000 will satisfy his restitution obligation.

**e.** **Aggravating Factors**

Page 146  -  **Government's Sentencing Memorandum**

Paul was a full participant in the Cavel West arson. Although not a leader as that term is used in the Sentencing Guidelines, he was involved in the planning, preparation and execution of the crime, and the recruitment of an accomplice. His other unlawful activities before and after the crime are further aggravating circumstances.

**f.    Mitigating Factors**

None

**g.    Cooperation**

As previously mentioned, a separate letter is being sent to the court detailing the extent and value of each defendant's cooperation.

**h.    Specific Advisory Guidelines Calculations**

As indicated in section III.B.2 above, Paul's base offense level is 38VI. To that the following adjustments should be made: Three levels should be subtracted for acceptance of responsibility under § 3E1.1, for an adjusted offense level of 35VI (292 - 365).

**i.    Sentence Recommendation**

Paul and the government understand and agree that the court will consider 18 U.S.C. § 3553(a) factors in determining the appropriate sentence in this case.

Based on the above, the government recommends up to a 17-level downward departure pursuant to U.S.S.G. § 5K1.1 for substantial assistance to authorities**,** in conjuction with § 3553(a) factors, for an ultimate advisory guideline of 18VI (57 - 71). The government recommends a sentence at the low end of the advisory guideline range, **57 months imprisonment**. Paul is free to request other adjustments or departures, but agrees not to request a sentence below 37 months or below the sentence imposed on co-defendant Darren Todd

Thurston, whichever is less.  The government will oppose any adjustments or departures below

its 57-month recommendation.

Respectfully submitted this 4th day of May, 2007.

KARIN J. IMMERGUT
United States Attorney
District of Oregon

/s/

_____

KIRK A. ENGDALL
Assistant United States Attorney

/s/

_____

STEPHEN F. PEIFER
Assistant United States Attorney

/s/

_____

JOHN C. RAY
Assistant United States Attorney

## <u>CERTIFICATE OF SERVICE</u>

I certify that I made service of the Government's Sentencing Memorandum on

defendants herein by mailing a full, true, and exact copy of said document this 4th day of May,

2007, in the U.S. Mail, with postage paid and addressed to:

Craig E. Weinerman                          Attorney for defendant Gerlach
Assistant Federal Public Defender
151 West 7th Avenue, Suite 510
Eugene, OR 97401


Patrick J. Ehlers                           Attorney for defendant Gerlach
Assistant Federal Public Defender
101 S.W. Main St., Suite 1700
Portland, OR 97204


Shaun McCrea                                Attorney for defendant Tankersley
1147 High Street
Eugene, OR 97401


Lee D. Foreman                              Attorney for defendant Tankersley
150 East 10th Avenue
Denver, CO 80203


Kelly R. Beckley                            Attorney for defendant McGowan
P.O. Box 11098
Eugene, OR 97440-3298


Jeffrey P. Robinson                         Attorney for defendant McGowan
810 Third Avenue, Suite 500
Seattle, WA 98104


Richard L. Fredericks                           Attorney for defendant Meyerhoff
750 Lawrence St., Suite 2
Eugene, OR 97401


Terri Wood                                  Attorney for defendant Meyerhoff
730 Van Buren Street
Eugene, OR 97402

Marc D. Blackman                                    Attorney for defendant Paul
1001 SW Fifth Avenue, Suite 1400
Portland, OR 97204


John J. Kolego                                      Attorney for defendant Savoie
804 Pearl Street
Eugene, OR 97401


Marc P. Friedman                                    Attorney for defendant Tubbs
P.O. Box 11167
Eugene, OR  97440


John Storkel                                        Attorney for defendant Zacher
Attorney at Law
1415 Liberty St. SE
Salem, OR 97302


William Sharp                                       Attorney for defendant Block
Attorney at Law
1342 High St., 2nd Floor
Eugene, OR 97401


Daniel L. Feiner                                    Attorney for defendant Thurston
Attorney at Law
1030 N.W. 12th, Unit 5
Portland, OR 97209


                                                    /s/
                                                    _____
                                                    CHERYL L. ROOT
                                                    Paralegal Specialist